IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

No. 17-0227

FILED

**May 17, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

CORTEZ L. BAREFIELD,
Defendant Below, Petitioner

Appeal from the Circuit Court of Wood County
The Honorable J. D. Beane, Judge
Case No. 15-F-101

REVERSED AND REMANDED

Submitted:  April 11, 2018
Filed:  May 17, 2018

Matthew Brummond, Esq.
Public Defender Services
Charleston, West Virginia
Attorney for Petitioner

Patrick Morrisey, Esq.
Attorney General
Zachary Aaron Viglianco, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorneys for Respondent

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE LOUGHRY dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.     "[T]he ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made." Syl. Pt. 2, in part, *State v. Lacy*, 196 W. Va. 104, 107, 468 S.E.2d 719, 722 (1996).

2.     "A search warrant . . . cannot be extended to authorize the arrest or search of a person not in any way connected with the place directed to be searched, who merely happens to be upon the premises, and who is not mentioned or described in the warrant or affidavit of probable cause upon which the warrant was issued." Syl. Pt. 1, in part, *State v. Massie*, 95 W. Va. 233, 120 S.E. 514 (1923).

3.     "Police may not use an initially lawful search as a pretext and means to conduct a broad warrantless search." Syl. Pt. 4, *State v. Lacy*, 196 W. Va. 104, 107, 468 S.E.2d 719, 722 (1996).

4.     An "all persons" warrant may validly authorize a search of all persons present on the premises to be searched insofar as the supporting affidavit demonstrates a detailed factual nexus among the criminal activity, the place of the activity, and the persons

i

reasonably likely to be present on the premises. In addition to a factual nexus, the supporting affidavit must more specifically demonstrate 1) that the area to be searched is small, confined, and private; 2) the nature of the suspected criminal activity is such that participants constantly shift and/or change, making it difficult to predict who may be present on the premises at any given time; and 3) that the items which are subject of the search are of a size or kind which renders them easily concealed and/or destroyed.

5. "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative." Syl. Pt. 1, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991).

6. "A warrantless search of the person and the immediate geographic area under his physical control is authorized as an incident to a valid arrest." Syl. Pt. 6, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980).

7. "An officer, with authority to conserve the peace, may, without a warrant, arrest any person who he, upon probable cause, believes has committed or is

committing a felony, though it afterwards appears that no felony was actually perpetrated." Syl. Pt. 2, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973).

8. "'Probable cause to make an arrest without a warrant exists when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed.'" Syl. Pt. 3, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973).

9. "Under the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule if it is shown that the evidence would have been discovered pursuant to a properly executed search warrant." Syl. Pt. 3, *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170 (2002).

10. "To prevail under the inevitable discovery exception to the exclusionary rule, Article III, Section 6 of the West Virginia Constitution requires the State to prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct." Syl. Pt. 4, *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170 (2002).

11. "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *State v. Blair*, 158 W. Va. 647, 648, 214 S.E.2d 330, 331 (1975).

Workman, C. J.:

This is an appeal from the November 30, 2016, order of the Circuit Court of Wood County sentencing petitioner Cortez Barefield (hereinafter "petitioner") to one to fifteen years in the penitentiary on his conviction of possession of a controlled substance, cocaine, with intent to deliver. Petitioner asserts that the circuit court erred by admitting evidence seized from petitioner in violation of the Fourth Amendment to the United States Constitution and Article III, section 6 of the West Virginia Constitution. Specifically, petitioner claims that evidence seized from his person was obtained without a search warrant and that none of the exceptions to the warrant requirement are satisfied.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the circuit court erroneously admitted evidence seized as the result of an unlawful, warrantless search, which fails to satisfy any of the exceptions to the warrant requirement. We therefore reverse petitioner's conviction and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

On January 21, 2015, Officer Michael Pifer ("Officer Pifer") of the Vienna Police Department and member of the Parkersburg Violent Crime and Narcotics Task Force unit obtained a search warrant for 925 Lynn Street, Parkersburg, West Virginia, which home was owned by Eric Salyers. Officer Pifer provided an affidavit in support of probable cause that stated that a confidential informant advised him that Mr. Salyers and

1

his wife Keisha were selling heroin from their residence. The confidential informant then engaged in two controlled purchases of heroin at the residence from Mr. Salyers. Based upon this information, Officer Pifer's affidavit requested a search warrant for the residence at 925 Lynn Street and that the warrant "cover all structures on this property," and "*shall also cover search of any* vehicles and *persons located on this property*." (emphasis added).

Magistrate Brenda K. Marshall issued a form search warrant referencing a list of items to be seized from 925 Lynn Street including controlled substances, records, currency, photographs, paraphernalia, firearms, and other evidence of possession with intent to distribute controlled substances. In the section provided for "grounds for probable cause," the warrant states "See Affidavit." The warrant then states:

> You are therefore, commanded in the name of the State of West Virginia *to search forthwith the premises above described and all appurtenances thereto* for the property above specified, to seize such property and bring the same before me to be dealt with according to law.

(emphasis added).

A SWAT team then executed the search warrant at 925 Lynn Street, removing petitioner and three other people from a bedroom in the home to search it. Arrest warrants were served on Mr. Salyers, his wife, and Kalem Casto, an acquaintance of the Salyers who was living in their guest room. Petitioner was handcuffed and removed to the front yard where he was subjected to a second pat-down and search by Officer Pifer. Officer Pifer seized approximately $865 in cash, a pay stub, an Ohio ID card belonging to

2

petitioner, a social security card, and a VISA debit card in someone else's name from petitioner's person. During the search of the home, the police found three separate controlled substances in the bedroom where petitioner was found and therefore arrested petitioner and the three other individuals who were in the bedroom.

Petitioner was indicted on three counts of possession with intent to deliver, second offense; the three controlled substances were cocaine, methamphetamine, and oxycodone. At trial, Kalem Casto testified that he was at the residence at the time of the raid and had sold heroin to two individuals there; those same individuals also wanted to buy crack cocaine, but Mr. Casto had none. He contacted petitioner to bring crack cocaine to sell to the individuals. Petitioner came to the residence and waited in the bedroom for the individuals to return with more money to buy the cocaine. It was at this time that the raid occurred. Mr. Casto denied that any of the drugs found in the bedroom belonged to him or any other individuals in the room.[1] Mr. Salyers also testified that he was present at the home and saw petitioner arrive with several baggies containing crack cocaine and methamphetamine; he testified that petitioner discussed having oxycodone as well. Both Mr. Casto and Mr. Salyers agreed to give testimony against petitioner as part of their plea agreements.

---

[1] Also in the room were Isaiah Ocee, Michaela Butcher, and Nathan Casto (Kalem's brother who is now deceased). Mr. Casto testified that all three purchased drugs from him and were drug abusers.

Prior to trial, petitioner filed three motions to exclude all or part of the evidence seized from his person during the raid. During the evidentiary hearings on the motions, Officer Pifer testified that the individuals in the bedroom were brought outside of the home to process both the people and property and ensure no one tampered with evidence. Officer Pifer confirmed that petitioner was patted down and handcuffed by the SWAT team before he searched him outside. Importantly, Officer Pifer testified that he believed that he was acting pursuant to the search warrant when he searched petitioner's person. He stated he was searching for both weapons and contraband. He further testified that while on the scene, due to the discovery of drugs in the bedroom where petitioner was located, he developed probable cause to arrest petitioner and typically, incident to arrest, he performs an inventory search on items on an individual. He stated that he knew the home to be one used for drug transactions and that petitioner specifically was known to him as being someone involved in a prior controlled buy at the Red Roof Inn. Officer Pifer conceded that although his search occurred before the drugs were found, he would have kept petitioner in custody until that search was completed and therefore the items seized would have been discovered on his person incident to arrest.

The circuit court denied petitioner's motions to suppress, finding that the search of petitioner was not unreasonable because of petitioner's presence at the home, where the police had "reliable information that the residence was being used at the time as a place from which controlled substances were being bought and sold." The circuit court further referenced Officer Pifer's familiarity with petitioner's involvement in drug

4

trafficking and the need to ensure he and others were neither a safety risk nor destroyed contraband. The circuit court seemingly also referenced the inevitable discovery rule by stating that Officer Pifer could have "replace[d]" the evidence on petitioner's person and then "seize[d] it again after unlawful drugs were found in the home."

Petitioner was found guilty of only one count: possession of a controlled substance, cocaine, with intent to deliver. He was found not guilty of possession of methamphetamine and oxycodone. The circuit court sentenced him to one to fifteen years and this appeal followed.

## II. STANDARD OF REVIEW

It is well-established that

> the ultimate determination as to whether a search or seizure was reasonable under the Fourth Amendment to the United States Constitution and Section 6 of Article III of the West Virginia Constitution is a question of law that is reviewed *de novo*. . . . Thus, a circuit court's denial of a motion to suppress evidence will be affirmed unless it is unsupported by substantial evidence, based on an erroneous interpretation of the law, or, based on the entire record, it is clear that a mistake has been made.

Syl. Pt. 2, in part, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996). "When we review the denial of a motion to suppress, we consider the evidence in the light most favorable to the prosecution." *State v. Lilly*, 194 W. Va. 595, 600, 461 S.E.2d 101, 106 (1995). With these principles in mind, we proceed to petitioner's assignment of error.

# III. DISCUSSION

Petitioner raises only one assignment of error: that the seizure of the items[2] from his person during the execution of the search warrant were the result of an illegal warrantless search and that no recognized legal exceptions to the warrant requirement apply. The State maintains that the warrant permitted the search of all persons on the premises, including petitioner, and that in any event, the evidence is admissible pursuant to the inevitable discovery doctrine since it would have been discovered during a search incident to arrest of petitioner.[3] Petitioner counters that no probable cause to arrest him existed and therefore, there was no lawful arrest to which a search would have been incident. While we ultimately conclude that the warrant at issue, neither on its face nor as an "all persons" warrant, lawfully permitted the search of petitioner, we take this opportunity to address the potential validity of such a warrant as well as the requirements for its proper procurement and issuance.

## A.     Validity of the Search Warrant

This Court long-ago held that

---

[2] The parties focus primarily on the cash, pay stub, and identification card. There is little to no discussion of the VISA debit card or social security card, as neither were characterized as probative evidence of drug trafficking at trial.

[3] The State apparently abandons its "officer safety" argument since petitioner had been patted down and was handcuffed at the time of the search. In a footnote in its brief, however, the State claims that it "does not concede" the officer safety exception is inapplicable, referencing Officer Pifer's testimony that he conducted the search for "weapons and contraband." However, other than this sentence in a footnote, the State makes no further argument in support.

> [a] search warrant . . . cannot be extended to authorize the arrest or search of a person not in any way connected with the place directed to be searched, who merely happens to be upon the premises, and who is not mentioned or described in the warrant or affidavit of probable cause upon which the warrant was issued.

Syl. Pt. 1, in part, *State v. Massie*, 95 W. Va. 233, 120 S.E. 514 (1923); *see also* Syl. Pt. 3, in part, *Lacy*, 196 W. Va. 104, 468 S.E.2d 719 ("A search warrant must particularly describe the place to be searched and the things or persons to be seized."); *State v. Ayala*, 762 P.2d 1107, 1111 (Utah Ct. App. 1988) ("[A] warrant authorizing the search of premises does not authorize officers to search an individual merely because that person is present on the premises[.]").  Moreover, "[p]olice may not use an initially lawful search as a pretext and means to conduct a broad warrantless search."  Syl. Pt. 4, *Lacy*, 196 W. Va. 104, 468 S.E.2d 719.  *See also Ybarra v. Illinois*, 444 U. S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person").

As indicated, petitioner argues that the face of the warrant neither authorized a search of petitioner, who was a mere visitor at the home, nor did it authorize the search of all persons on the premises.  The State maintains that the warrant permitted law enforcement to validly search all persons present on the premises pursuant to a so-called "all persons" warrant, which purports to grant authority to search all persons found at a particular location.  While West Virginia has not yet addressed the validity of such a warrant, we note that a majority of states, as well as the Fourth Circuit, have determined

7

that such a warrant "is not unconstitutional *per se*" but may be found to be valid as long as there is sufficient probable cause to justify the search of all persons located on the premises. *State ex rel. Owens v. Lott*, 372 F.3d 267, 275 (4th Cir. 2004) (emphasis in original); *see U. S. v. Guadarrama*, 128 F. Supp.2d 1202 (E. D. Wis. 2001) (analyzing cases and tallying jurisdictions permitting "all persons" warrants). Of the approximate eight jurisdictions that have rejected the warrants as facially unconstitutional, most have done so on the basis that they are "uncomfortabl[y] similar[]" to general warrants, which the Fourth Amendment was designed to address. *Id*. at 1207. Notably, the United States Supreme Court has expressly declined to opine on the validity of such a warrant. *See Ybarra*, 444 U.S. at 92 n.4 ("Consequently, we need not consider situations where the warrant itself authorizes the search of unnamed persons in a place and is supported by probable cause to believe that persons who will be in the place at the time of the search will be in possession of illegal drugs.").

Among the states recognizing the potential validity of such warrants, there is unwavering consensus that the constitutionality of the search rises or falls with whether the search warrant affidavit provides a "sufficient nexus among the criminal activity, the place of the activity, and the persons in the place to establish probable cause." *People v. Johnson*, 805 P.2d 1156, 1159 (Colo. Ct. App. 1990). In one of the first cases to recognize such a warrant, the New Jersey Supreme Court attempted to debunk the ostensible fear that "all persons" warrants were tantamount to general warrants by reasoning that "there is none of the vice of a general warrant if the individual is [] identified by physical nexus to the on-

8

going criminal event itself," particularly where "the place is so limited and the illegal operation so overt that it is likely that everyone present is party to the offense." *State v. DeSimone*, 288 A.2d 849, 850 (N. J. 1972).

The necessity of a factual nexus to establish probable cause to search is hardly new ground in this Court or elsewhere: "There must be a nexus between the criminal activity and the place or person searched and thing seized." *Lilly*, 194 W. Va. at 602, 461 S.E.2d at 108 (citing 1 Franklin D. Cleckley, Handbook on West Virginia Criminal Procedure I-358 (1994)). The precise contours of this nexus as pertains to an "all persons" warrant, however, is a bit blurry at the edges. For instance, the Fourth Circuit has held that the nexus among criminal activity, the premises, and its occupants is insufficient if there is not "probable cause to believe that *everyone* found on the premises being searched is involved in the illegal activity and that evidence of the crime would be found on their person." *Owens*, 372 F.3d at 275 (emphasis in original). The *Owens* court explained that the supporting affidavit requires "information that would [] permit[] the magistrate to reasonably conclude that there was *a fair probability* that *any* person seen by officers on the premises was there to partake in one side of a drug transaction or another." *Id.* at 276 (emphasis added). Under those circumstances, "presence becomes the descriptive fact satisfying the aim of the Fourth Amendment." *DeSimone*, 288 A.2d at 850.[4]

---

[4] However, "*mere* presence cannot supply the reasonable connection to the illegal activity." *Bergeron v. State*, 583 So.2d 790, 791 (Fla. Dist. Ct. App. 1991) (emphasis added).

9

In slight contrast, however, the South Dakota Supreme Court has cautioned that "[t]he issuance of an 'all persons' search warrant does not require a *guarantee* that everyone who might appear during the search must be involved in drug activity. That is too high a burden." *State v. Jackson*, 616 N.W.2d 412, 420 (S.D. 2000) (emphasis added). Rather, the *Jackson* court concurred with the Pennsylvania Superior Court's view as stated in *Commonwealth v. Graciani*, 554 A.2d 560, 562-63 (Pa. Super. Ct. 1989), that

> [t]hough it is certainly possible, even probable, that innocent third parties who happen to be at the wrong place at the wrong time may be subjected to searches under such warrants, the nexus between the person to be searched and the nature and the seriousness of the criminal conduct suspected on probable cause, nonetheless, renders the *probability* of their culpable participation in the crime suspected sufficient to warrant a search of their person to prevent the destruction or concealment of evidence of the crime suspected.

(emphasis in original). These semantical differences in describing the quantum of probability notwithstanding, however, we agree that at its essence, "[p]robable cause is not a technical, legalistic concept but a flexible, common-sense measure of the plausibility of particular conclusions about human behavior." *State v. Hayes*, 540 N.W.2d 1, 3 (Wis. Ct. App. 1995). This observation is no less true simply because an "all persons" warrant is involved.

However, courts which have recognized the potential validity of "all persons" warrants have universally agreed that they "require greater factual support than other warrants," and certain have cautioned that they "do not sanction the routine use" of such warrants. *Jackson*, 616 N.W.2d at 420; *see also State v. Prior*, 617 N.W.2d 260, 267-

10

68 (Iowa 2000) (explaining that constitutional rights require such warrants be "issued only under constrained circumstances"). The Court of Appeals of New York comprehensively explained that

> [a]n application for this type of warrant must be subjected to rigid scrutiny by the independent Magistrate. It must carefully delineate the character of the premises, for example, its location, size, the particular area to be searched, means of access, neighborhood, its public or private character and any other relevant fact. It must specifically describe the nature of the illegal activity believed to be conducted at the location, the number and behavior of persons observed to have been present during the times of day or night when the warrant is sought to be executed.
>
> The application should also state whether any person apparently unconnected with the illegal activity has been seen at the premises. The warrant itself must limit the locus of the search to the area in which the criminal activity is believed to be confined and, according to the circumstances, may also specify the time for the search.
>
> In determining the reasonableness of a particular warrant application, it is also appropriate to consider the necessity for this type of search, that is, the nature and importance of the crime suspected, the purpose of the search and the difficulty of a more specific description of the persons to be searched. The risk that an innocent person may be swept up in a dragnet and searched must be carefully weighed.

*People v. Nieves*, 330 N.E.2d 26, 34 (N. Y. Ct. App. 1975) (footnote omitted). Particular scrutiny has been given to whether the warrant is executed during the day when legitimate visitors may be present or at night when those present are likely to be involved in the criminal activity. *See Jackson*, 616 N.W.2d at 419 (favoring nighttime search "making it improbable that innocent people would show up by happenstance"); *State v. Wynne*, 552 N.W.2d 218, 221 (Minn. 1996) (suppressing evidence on basis of warrant which was to be

11

served only during daytime hours when "relatives, guests or hired workpeople could have been present on the residential premises to be searched"). With respect specifically to search warrants for residences used for drug trafficking, many courts have focused on whether surveillance has revealed short-term comings and goings indicative of drug trade and whether there is a history of controlled buys or confidential informant verification of ongoing drug trafficking. This heightened factual requirement is particularly necessary when the search takes place in a private residence: "There is no question but that activities which take place within the sanctity of the home merit the most exacting Fourth Amendment protection." *Lacy*, 196 W. Va. at 111, 468 S.E.2d at 726 (footnote omitted).[5]

Although "[w]hat amount of evidence is required to form probable cause is not a question susceptible to formulaic solutions[,]" tests have emerged to ensure that the context of the search aids in combatting constitutionally impermissible overbreadth. *Jackson*, 616 N.W.2d at 420.[6] For example, the Massachusetts Supreme Court has held

---

[5] As a result, with respect to "all persons" warrants, there is an inevitable tension between the preeminent protection afforded to private residences and the countervailing fact that "[t]he more public a place, the less likely a search of all persons will be sustained." *Guadarrama*, 126 F. Supp.2d at 1212. We believe that this simply underscores the very limited circumstances under which such a warrant will be deemed constitutionally valid.

[6] This Court has instructed generally, however:

Under the Fourth Amendment to the United States Constitution and Article III, Section 6 of the West Virginia Constitution, the validity of an affidavit for a search warrant is to be judged by the totality of the information contained in it. Under this rule, a conclusory affidavit is not acceptable nor is

12

that for an "all persons" warrant to be valid, the following requirements must be met: 1) that the area to be searched is "small, confined and private"; 2) that "the nature of the criminal activity is such that participants (in general) constantly shift or change" making it "practically[] impossible" to predict who may be there specifically at any given time; and 3) that the items being seized "are of a size or kind which renders them easily and likely to be concealed on the person." *Commonwealth v. Smith*, 348 N.E.2d 101, 107 (Mass. 1976); *see State v. Covington*, 904 P.2d 209, 212 (Utah Ct. App. 1995) (approving *Smith* factors).

In view of the foregoing, we agree that, under appropriate circumstances, an "all persons" warrant may validly authorize a search of all persons present on the premises to be searched. For such a warrant to survive constitutional muster, however, the supporting affidavit must demonstrate a particularly detailed factual nexus among the criminal activity, the place of the activity, and the persons reasonably likely to be present on the premises. In addition to a factual nexus, the supporting affidavit must more specifically demonstrate 1) that the area to be searched is small, confined, and private; 2) the nature of the suspected criminal activity is such that participants constantly shift and/or change, making it difficult to predict who may be present on the premises at any given time; and 3) that the items which are the subject of the search are of a size or kind which

---

an affidavit based on hearsay acceptable unless there is a substantial basis for crediting the hearsay set out in the affidavit which can include the corroborative efforts of police officers.

Syl. Pt. 4, *State v. Adkins*, 176 W.Va. 613, 346 S.E.2d 762 (1986).

13

renders them easily concealed and/or destroyed. In reaching this holding, we are mindful of the considerable constitutional interests at stake as evidenced by the particularized showing required. Nevertheless, we offer the following observation, as well-stated by the Iowa Supreme Court:

> This standard protects individual rights, while recognizing the interests of law enforcement. It does not mean, however, that police must know with certainty that all persons in the premises will possess evidence of criminal activity at the time of the search. It also does not mean that innocent people will never be caught in the middle of an "all persons" search. The Fourth Amendment only protects people "against unreasonable search and seizure." Moreover, probable cause does not require absolute certainty, but a probable determination through the eye of a reasonably prudent person.

*Prior*, 617 N.W.2d at 268 (citations omitted).

The foregoing notwithstanding, however, it is clear that the search warrant at issue did not permit Officer Pifer's search of petitioner's person. It is indisputable that the warrant and affidavit in no way reference petitioner. "It is a fundamental rule of law that a warrant must name or describe with particularity the property to be seized and the person or place to be searched." *Commonwealth v. Eichelberger*, 508 A.2d 589, 592 (Pa. Super. Ct. 1986). In fact, because the police had arrest warrants for Mr. Salyers, his wife, and Mr. Casto, the warrant did not even reference searching these specific individuals, who owned and/or lived in the house. The warrant authorizes a search of 925 Lynn Street and nothing more. Petitioner's mere presence at the home at the time the warrant was executed subjected him *only* to detention while the search was being conducted. "[A] warrant

14

authorizing a search of a building does not authorize a search of those present when the warrant is executed." *Commonwealth v. Wilson*, 631 A.2d 1356, 1359 (Pa. Super. Ct. 1993); *see also Michigan v. Summers*, 452 U. S. 692, 692 (1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted").

For much the same reasons, the warrant in the present case fails to qualify as a valid "all persons" warrant. The only reference to "all persons" is contained in the officer's *affidavit* which, in the final paragraph, states: "This warrant requested shall also cover search of any vehicles and persons located on this property." However, as petitioner notes, simply because the officer requested to search all persons does not mean the magistrate granted him authority to do so; in fact, the search warrant does not.[7] As the Fourth Circuit has observed, "the particularity requirement of the Fourth Amendment is

---

[7] The State does not address the distinction between the officer's "request" for an all persons warrant in the affidavit and the fact that the language of the warrant itself authorizes no such search. Nor does the State offer any argument that the affidavit was somehow "incorporated by reference" into the warrant itself. The sole reference to the affidavit contained on the face of the search warrant is in the section stating: "[G]rounds for probable cause of the issuance of this warrant are as follows: See Affidavit[.]"

The State also does not frame an argument around the fact that the magistrate signed the affidavit as potential evidence of incorporation by reference. It appears, however, that the magistrate's signature is in the nature of a sworn acknowledgment since the affidavit otherwise bears no notarial seal or otherwise states that it was "sworn and/or subscribed to" before anyone qualified to give an oath. *See Adkins*, 176 W. Va. at 619, 346 S.E.2d at 768 ("Both the Fourth Amendment to the United States Constitution and Article III, Section 6 of our Constitution provide that no warrant shall issue except upon probable cause supported by oath or affirmation.").

15

directed at the warrant as opposed to the supporting affidavit." *Owens*, 372 F.3d at 274

(citing *Groh v. Ramirez*, 540 U. S. 551, 557 (2004). The search warrant itself only

commands the officer "to search forthwith the premises above described and all

appurtenances thereto for the property above specified[.]" We therefore conclude that the

search conducted of petitioner was indeed a warrantless search inasmuch as the subject

warrant neither identifies petitioner nor qualifies as a valid "all persons" warrant. *See*

*Wilson*, 631 A.2d at 1359 ("The section of the warrant which identified the person or place

to be searched described only the residence at E-25 Lloyd Street. It did not anywhere

mention Robert Wilson. This warrant, therefore, was insufficient to authorize a search of

appellant[.]"); *cf. Jackson*, 616 S.W.2d at 422 (Sabers, J., dissenting) (observing that

defendant "was not a particularized target of the warrant and was not specifically

mentioned in the affidavit supporting the warrant.").

## B.     *EXCEPTIONS TO THE WARRANT REQUIREMENT*

Having determined that the search of petitioner was warrantless, we must

then determine whether the search falls into one of the well-recognized exceptions to the

necessity of a warrant:

> Searches conducted outside the judicial process,
> without prior approval by judge or magistrate, are *per se*
> unreasonable under the Fourth Amendment and Article III,
> Section 6 of the West Virginia Constitution—subject only to a
> few specifically established and well-delineated exceptions.
> The exceptions are jealously and carefully drawn, and there
> must be a showing by those who seek exemption that the
> exigencies of the situation made that course imperative.

16

Syl. Pt. 1, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). As indicated above, petitioner maintains that the search warrant exceptions identified by the circuit court— officer safety and inevitable discovery—are inapplicable. [8] The State, offering no substantive argument in support of the officer safety exception,[9] appears to rely solely on the inevitable discovery rule. "When the State seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception." *Lacy*, 196 W. Va. at 111, 468 S.E.2d at 726.

The State contends that upon discovering the drugs inside the home, the police then had probable cause to arrest petitioner and perform a search incident to arrest. Accordingly, the evidence would have been "inevitably discovered." Petitioner counters

---

[8] The State likewise makes no argument in support of the "good faith exception": "[The] 'good faith' exception 'is based on the premise that the exclusion of evidence under the Fourth Amendment is not warranted where a police officer acts in good faith reliance on the warrant issued by the magistrate.'" *State v. Hlavacek*, 185 W. Va. 371, 379, 407 S.E.2d 375, 383 (1991) (quoting *Adkins*, 176 W.Va. at 624, 346 S.E.2d at 774). Here, Officer Pifer testified that he believed that he had a valid warrant to search all persons on the premises. However, the exception is not applicable where the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *U. S. v. Leon*, 468 U.S. 897, 923 (1984).

[9] It is clear, however, that the officer safety exception would not apply inasmuch as petitioner had already been patted down for weapons and was handcuffed at the time of the search, posing no appreciable officer safety risk.

that 1) the police never had probable cause to arrest him, therefore any search stemming from an unlawful arrest is likewise illegal; and 2) the police were not pursuing a valid line of investigation which would permit them to search petitioner, as required by *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170 (2002).

### 1.     *Probable cause to arrest*

To determine whether the evidence may have been inevitably discovered pursuant to a search incident to arrest, we must first determine if the arrest was validly supported by probable cause. "A warrantless search of the person and the immediate geographic area under his physical control is authorized as an incident to a *valid* arrest." Syl. Pt. 6, *Moore*, 165 W.Va. 837, 272 S.E.2d 804 (emphasis added). Therefore, for a search incident to arrest to be lawful, the arrest must be valid. "The predicate for a [warrantless search incident to arrest], however, is an initial lawful arrest." *Id.*, 165 W. Va. at 851, 272 S.E.2d at 813.[10]

With regard to warrantless arrests, the Court has held that "[a]n officer, with authority to conserve the peace, may, without a warrant, arrest any person who he, upon probable cause, believes has committed or is committing a felony, though it afterwards appears that no felony was actually perpetrated." Syl. Pt. 2, *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973). "'Probable cause to make an arrest without a warrant exists

---

[10] *Overruled on other grounds by State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991), and *abrogated on other grounds by Horton v. California*, 496 U. S. 128 (1990).

when the facts and the circumstances within the knowledge of the arresting officers are sufficient to warrant a prudent man in believing that an offense has been committed.'" Syl. Pt. 3, *Id.*

Petitioner argues that his mere proximity to the drugs discovered in the bedroom in which he was located, along with three other people, is insufficient to establish probable cause to arrest him. The State counters that the discovery of controlled substances in a small room where petitioner was located, coupled with Officer Pifer's "prior knowledge" of petitioner's involvement in a controlled purchase, is sufficient to create probable cause.

Clearly, "[w]hen executing a warrant to search a residence, the police have authority to detain individuals who happen to be present. However, in order to search or arrest them, the police must establish independent probable cause." *Wilson*, 631 A.2d 1356 at 1359. In that regard, courts nationwide have made clear that "mere proximity" to contraband is insufficient to establish probable cause. *See, e.g. People v. Reynolds*, 518 N.Y.S.2d 551, 552 (N.Y. Crim. Ct. 1987) ("The mere presence of the defendant in the company of persons engaged in narcotics transactions does not constitute probable cause for arrest[.]"); *United States v. Boone*, No. 02 CR 1185(RPP), 2003 WL 841088, at *5 (S.D.N.Y. Mar. 6, 2003) ("[M]ere presence in an apartment where drugs and a firearm are found is insufficient to establish probable cause to arrest a person when there is no reason to link that person to the illegal items.").

19

At best, then, the information giving rise to probable cause in the instant case was that petitioner 1) was known to the officer as having been "involved" in a prior controlled buy; and 2) was found in a house, along with several other drug dealers and/or abusers, where drugs were discovered. Significantly, however, there were three other people in the bedroom with petitioner where the drugs were found and two to three other adults elsewhere in the small house—any of whom could have been the owner and/or possessor of the drugs. In fact, that drugs were found on premises has a particularly tenuous connection to petitioner individually, where the entire purpose of the search warrant was to search for drugs and other contraband as evidence of the drug dealing of the *three other people* who were the actual subject of the investigation. Therefore, that drugs were found is hardly surprising and in fact what police believed they would find as evidence of Mr. and Mrs. Salyers' and Mr. Casto's drug activities. Attributing those drugs to petitioner then, as opposed to any other individual in the house and/or specifically the bedroom where they were found—particularly those who were the target of the investigation—is devoid of logic. Moreover, little weight is added to the probable cause analysis on the basis of Officer Pifer's prior "familiarity" with petitioner. The record lacks any indication as to what particular beliefs or conclusions Officer Pifer had drawn about petitioner as result of his involvement in the prior controlled buy.[11]

---

[11] In fairness, however, Officer Pifer did not give great detail about petitioner's role in this other incident because it had been determined to have involved use of an illegal electronic intercept. He testified merely that he recognized petitioner from the other

*2.      Application of the Inevitable Discovery Rule*

However, even assuming *arguendo* that probable cause *did* exist to arrest petitioner, West Virginia's iteration of the inevitable discovery rule is not satisfied here such as to render the evidence admissible. "Under the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule if it is shown that the evidence would have been discovered pursuant to a properly executed search warrant." Syl. Pt. 3, *Flippo,* 212 W. Va. 560, 575 S.E.2d 170. However,

> [t]o prevail under the inevitable discovery exception to the exclusionary rule, Article III, Section 6 of the West Virginia Constitution requires the State to prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the *police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct*.

Syl Pt. 4, *Id*. (emphasis added).

In comparing the majority and minority views on inevitable discovery, the *Flippo* Court explained that under the majority rule, "'if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence,'"

---

incident and that he went by the name of "C. J." Regardless, however, of the reason why the record lacks additional information about petitioner's involvement in the prior controlled buy, this Court cannot speculate about the circumstances of petitioner's involvement in that incident, much less the reasonableness of the conclusions Officer Pifer may have drawn, if any, about petitioner's propensity to be involved in drug trafficking as a result.

21

the evidence is admissible. *Id.* at 580, 575 S.E.2d at 190 (quoting *U. S. v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998)). The Court then concluded that only the *minority* rule set forth above was consistent with our Constitution: "In adopting the minority view, we do so with a practical realization that '[i]f police are allowed to search when they possess no lawful means and are only required to show that lawful means could have been available even though not pursued, the narrow "inevitable discovery" exception would "swallow" the [constitutional warrant] protection.'" *Id.* (quoting *State v. Hatton*, 389 N.W.2d 229, 234 (Minn. Ct. App. 1986)). Therefore, it is insufficient to simply argue that police would have inevitably discovered the drugs while following their "routine procedures" upon arresting petitioner. This is the position taken by the State in this matter and represents precisely the majority approach which the Court rejected in *Flippo*.

Accordingly, even if one accepts the State's argument that it had probable cause to arrest petitioner, necessitating a search incident to arrest and that there was therefore a "reasonable probability" that the evidence would have been discovered, the State must still prove the two remaining elements of *Flippo*: that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the illegal search. The State contends the "lead" making the discovery inevitable was the search warrant; however, a reasonable argument could be made that the "lead" was actually the discovery of the drugs in the bedroom where

22

petitioner was located, which discovery occurred *subsequent* to Officer Pifer's illegal search.

However, we need not engage in a theoretical debate about which of these positions is more compelling inasmuch as the final requirement of *Flippo* is demonstrably lacking. Clearly, the police were not "actively pursuing a lawful alternative line of investigation to seize" the items from petitioner because they believed their existing warrant permitted them to search petitioner. Police were not pursuing, nor did they at any time, pursue a warrant to search or arrest petitioner. It is this final requirement of *Flippo* which most markedly separates West Virginia's more restrictive view of the inevitable discovery doctrine from the more lax, majority view permitting mere "routine procedure" to pave a pathway toward discovery, and therefore admissibility, of the evidence.

Therefore, we conclude that the evidence seized from petitioner and admitted as evidence at trial was obtained pursuant to an unlawful warrantless search and should have been suppressed. The circuit court's failure to do so, therefore, constitutes reversible error: "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *State v. Blair*, 158 W. Va. 647, 648, 214 S.E.2d 330, 331 (1975). Accordingly, we are left only to determine if the illegal search and the evidence adduced therefrom was harmless beyond a reasonable doubt.

23

### 3. *Harmless Error*

In asserting that the introduction of illegally-seized evidence was not harmless, petitioner highlights that, even with this evidence, he was acquitted of two out of three counts of possession with intent to deliver. Petitioner maintains that without the illegally-seized evidence the jury would have been left with nothing more than the inherently suspect testimony of two drug dealers who "cut deals" to testify against him in exchange for leniency. The State, for reasons that are not clear, does not make an argument in support of harmless error, ostensibly choosing to rest on the strength of their argument in support of the validity of the search.[12]

Viewing the evidence even in the light most favorable to the prosecution as required by *Lilly*, we cannot conclude that the error was harmless. 194 W. Va. 595, 461 S.E.2d 101. Aside from the evidence unlawfully seized from petitioner, the prosecution offered only the testimony of two admitted drug dealers and abusers who were also arrested and were in fact the actual targets of the same raid, both of whom agreed to testify against petitioner as a condition of their pleas. More importantly, however, the jury ostensibly found one of those witnesses—Mr. Salyers—entirely incredible regarding petitioner's possession of methamphetamine and oxycodone inasmuch as he was acquitted of those charges. Mr. Salyers' testimony was the only evidence as to petitioner's possession of

---

[12] *See* W. Va. Rule of Appellate Procedure 10(d) ("If the respondent's brief fails to respond to an assignment of error, the Court will assume that the respondent agrees with the petitioner's view of the issue.").

those two illegal substances.  Therefore, when the remaining witness' testimony about summoning petitioner to the house to sell crack cocaine is coupled with the seizure of a large sum of cash from petitioner's person—evidence which is consistent with and supportive of the prosecution's theory of the case and the testimony of the primary witness—we cannot conclude that the admission of the unlawfully seized evidence was harmless beyond a reasonable doubt.

## IV.  CONCLUSION

Therefore, based upon the foregoing, we reverse petitioner's conviction and remand for a new trial.

Reversed and remanded.